[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

**RECEIVED**

**APR 2 4 2023**

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

Hanoi Barbaro Acosta (87406-008)

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

United States of America;

M. Bergmann; Counselor Barmes;
T. Cruze; Burlinson; Walls;

T. Mandeville; Wilson; and;
Root.

_____

_____

_____

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

Case No: 3:22-cv-50156
(To be supplied by the Clerk of this Court)

Hon. Philip G. Reinhard

**CHECK ONE ONLY:**                    **AMENDED COMPLAINT**

_____  **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983 U.S. Code** (state, county, or municipal defendants)

__X__  **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE 28 SECTION 1331 U.S. Code** (federal defendants)

__X__  **OTHER** (cite statute, if known) ; Federal Tort Claim Act; 28 U.S.C. §§ 1346(b), and 2201.

*BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.*

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

I. **Plaintiff(s):**

    A.    Name: Hanoi Barbaro Acosta

    B.    List all aliases: N/A

    C.    Prisoner identification number: 87406-008

    D.    Place of present confinement: FCI Talladega

    E.    Address: PMB 1000, Talladega, AL 35160

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II. **Defendant(s):**

(In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

    A.    Defendant: United States of America

            Title: Government

            Place of Employment: United States of America

    B.    Defendant: M. Bergmann

            Title: Nurse

            Place of Employment: Administrative U.S. Penitentiary-Thomson

    C.    Defendant: Barmes

            Title: Counselor

            Place of Employment: Administrative U.S. Penitentiary-Thomson

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

 Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**II. Defendant(s)(Cont'd):**

D. Defendant: T. Cruze

Title: Special Investigative Supervisor Technician

Place of Employment: Administrative U.S. Penitentiary-Thomson

E. Defendant: Burlinson

Title: Case Manager

Place of Employment: Administrative U.S. Penitentiary-Thomson

F. Defendant: Walls

Title: Correctional Officer

Place of Employment: Administrative U.S. Penitentiary-Thomson

G. Defendant: T. Mandeville

Title: Correctional Officer

Place of Employment: Administrative U.S. Penitentiary-Thomson

H. Defendant: Wilson

Title: Correctional Officer

Place of Employment: Administrative U.S. Penitentiary-Thomson

I. Defendant: Root

Title: Correctional Officer

Place of Employment: Administrative U.S. Penitentiary-Thomson

2A.

**III. List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

A. Name of case and docket number: Acosta v. Maricopa County Sheriff's Sheriff's Office, et al., No. CV-09-467-SRB(MEA)

B. Approximate date of filing lawsuit: May 1, 2009

C. List all plaintiffs (if you had co-plaintiffs), including any aliases: N/A

D. List all defendants: Joseph M. Arpiao; Unknown Nicholas; Daniel B. Durand.

E. Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): USDC-D. Ariz.(Phoenix Division).

F. Name of judge to whom case was assigned: Susan R. Bolton.

G. Basic claim made: Unauthorized digital cavity search was 4th Amend. violation.

H. Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): Claim barred by PLRA, because no physical injury. Dismissal affirmed on appeal.

I. Approximate date of disposition: November 23, 2011.

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

III. **List ALL Lawsuit you (and your co-plaintiffs, if any) have filed in any state of federal court on the United States (Cont'd):**

A. Name of case and docket number: Acosta v. Shartle, et al., No. CV-18-216-TUC-RM.

B. Approximate date of filing lawsuit: February 23, 2019.

C. List all plaintiffs: N/A.

E. Court in which the lawsuit was filed: USDC-D.Ariz. (Tucson Division).

F. Name of judge to whom case was assigned: Rosemary Martinez.

G. Basic claim made: SIS fabricated an incident report to send Acosta to the SMU; USA liable for food poisoning.

H. Disposition of case: USA settled.

I. Approximate date of disposition: April 2, 2019.

******

A. Name of case and docket number: In re BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, Case No. 20-10343.

B. Approximate date of filing lawsuit: Unknown.

C. List all plaintiffs: Unknown (Class action over 82,000 claimants).

D. List all defendants: Boy Scouts of America, Delaware BSA, LLC.

E. Court in which the lawsuit was filed: U.S. Bankruptcy Court of Delaware.

F. Name of judge to whom case was assigned: Laurie Silverstein

G. Basic claim made: Sexual abuse survivor claim.

H. Disposition of the case: Pending.

I. Approximate date of disposition: Currently pending.

******

A. Name of case and docket number: Acosta v. M. Bergmann, No. 21-cv-50194.

B. Approximate date of filing lawsuit: May 13, 2021.

3A.

C. List all plaintiffs: N/A.

D. List all defendants: M. Bergmann.

E. Court in which lawsuit was filed: USDC-N.D. Ill. (Western Division).

F. Name of judge to whom case was assigned: Philip G. Reinhard.

G. Basic claim made: Deliberate indifference to serious medical needs.

H. Disposition of the case: Pending.

I. Approximate date of disposition: Currently pending.

******

A. Name of case and docket number: Acosta v. United States of America, et al., No. 22-cv-50199.

B. Approximate date of filing lawsuit: June 1, 2022.

C. List all plaintiffs: N/A.

D. List all defendants: USA; Christopher Rivers; Unknown Captain; Besick; Wilson; Hammer; Root; and Burlinson.

E. Court in which the lawsuit was filed: USDC-N.D. Ill. (Western Division).

F. Name of judge to whom case was assigned: Philip G. Reinhard.

G. Basic claim made: The BOP's poor management of the COVID-19 pandemic amounts to deliberate indifference to serious medical needs; and medical negligence under Illinois State law.

H. Disposition of the case: Pending.

I. Approximate date of disposition: Currently pending.

3B.

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

### IV. Statement of Claim:

State here as briefly as possible the facts of your case. Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

1. The Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1346(a); the Fifth and Eighth Amendment(s) to the United States Constitution; and the Federal Tort Claim Act.("FTCA").

2. Plaintiff has exhausted all administrative remedies required by the Federal Bureau of Prisons ("BOP"), and has complied with all prerequisites to a suit under the FTCA in that: the Plaintiff timely filed an administrative claim for the matters in dispute in this action in the amountoof $2,500,000.00, with the BOP's North Central Regional Office. Which was denied.

3. Plaintiff is a resident of the State of Alabama. However, the majority of the events described in this Complaint occurred in Thomson, Illinois.

4. Defendant United States of America is sued under the FTCA for medical negligence, assault and battery, attempted murder, false imprisonment, official misconduct, and intentional infliction of emotional distress by law enforcement officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice-an agency of the United States.

4

Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5. Defendant M. Bergmann was, at all relevant times, an employee and nurse/officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice. This defendant is sued in her individual capacity.

6. Defendant Counselor Barmes was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America. This defendant is sued in his individual capacity.

7. Defendant T. Cruze was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America. This defendant is sued in his individual capacity.

8. Defendant Burlinson was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America. This defendant is sued in his individual capacity.

9. Defendant Walls was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America. This defendant is sued in his individual capacity.

10. Defendant T. Mandeville was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States

4A.

Department of Justice, and an agency of the United States of America. This defendant is sued in his individual capacity.

11. Defendant Wilson was, at all times relevant, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United states of America. This defendant is sued in his individual capacity.

12. Defendant Root was, at all relevant times, an employee and officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America. this defendant is sued in his individual capacity.

## Facts

13. Plaintiff ("Acosta"), and inmate Ruben Barrera ("Barrera"), both arrived at the Administrative United States Penitentiary-Thomson ("AUSP Thomson") on September 3, 2020. AUSP Thomson is located in Thomson, Illinois.

14. Acosta and Barrera were initially assigned to the same cell upon arrival, and remained cell mates for a period of time thereafter. After approximately two months, Acosta and Barrera began having cell problems. Death threats were made between the cell mates, and at that point the inmate mutually considered themselves enemies.

15. On November 10, 2020, however, in an attempt to avoid a physical altercation, the inmates wrote an Inmate Request, known as a "cop-out,"

4B.

to Defendant Barmes apprising him of the cell situation. They requested to be separated. Citing safety concerns as the basis for the move.

16. During a unit round, Barmes advised Acosta and Barrera that if they wanted to be separated they would have to "fight."

17. Not wanting to fight, and be meted out more punishment than they were already suffering at the Special Management Unit ("SMU") at AUSP Thomson (which consists of a 23 and 1 lock down program), Acosta and Barrera both wrote a cop-out to Lieutenant Williamson explaining the situation and asking to be separated.

18. The cop-out, however, was answered by Lieutenant ("Lt") Bowman, whom was filling in for Lt. Williamson. Acosta and Barrera verbally explained the situation to Lt. Bowman at the cell door. They informed him that an altercation was imminent if they were not immediately separated. Lt. Bowman told the inmates that he would compromise a move if Acosta and Barrera could just hold off until Monday.

19. Acosta and Barrera reluctantly agreed. That night however, tempers flared, and in the a.m. the inmates remounted their efforts to be separated.

20. Acosta wrote a cop-out to Lt. Cron, asking him to be separated from Barrera. Lt. Cron came to Acosta's assigned cell to speak with him and Barrera. They informed Lt. Cron of the situation. He told Acosta that he would speak to Defendant Counselor Barmes, and if Barmes approved the

4C.

move, he would do it. However, Lt. Cron did not otherwise separate the inmates on account that they were pleading imminent fight. Presumably because Barmes did not approve the move.

### Serious Medical Need

21. That same night–November 13, 2020– Acosta became severely ill with COVID-19. His symptoms included: difficulty breathing, aching bones, body aches, loose stools, and fever of 101.5 degrees. Under the guise of Acosta's emergency medical condition, Lt. Cron overrode Barmes' refusal to separate Acosta and Barrera, and moved Acosta into an empty cell from Unit E-1, Cell No. 18 to a makeshift quarantine wing in Unit E-4, Cell No. 18.

### Attempted Murder and Assault and Battery

22. On November 14, 2020, at approximately 1:07 pm, Defendant Root came to Acosta's cell door and ordered him to "cuff-up." Acosta asked him why? And Correctional Officer ("c/o") Root told him he did not know why. Acosta was suspicious of c/o Root's answer, and told Root he was not taking a cell mate, because he had a fever of over 104 degrees, and was otherwise too weak to defend himself should it be required. Defendant Walls came to Acosta's door and assured him that he was not getting a cell mate, but that he was going to medical to be examined instead. Because Acosta had recently contracted COVID-19, he believed Walls and cuffed-up.

23. When the c/o's rolled his cell door, however, Acosta was surprised to see Barrera, and all his personal belongings being led to his assigned

4D.

cell. Acosta immediately informed the c/o's at his door that he could not cell with Barrera, because Barrera was his enemy. Barrera also made the protest that Acosta was his enemy. Moreover, Defendant's Walls, Root, and Wilson possessed firsthand knowledge of what was transpiring between Acosta and Barrera in the days leading up to November 14, 2020, because the request to be separated, due to the imminent threat of an altercation, was first made precisely to these c/o's.

24. Barrera physically refused to enter the cell. However, c/o Butterfeild told him, "if you don't go in there I'm going to slam you on your face spic." C/o Butterfield and Defendant Wilson had an interest in forcing Barrera into the cell to fight Acosta, because on the way over to the quarantine wing Barrera heard the c/o's placing a $100.00 or $20.00 bet that the "Mexican gets his ass kicked." Barrera reluctantly entered the cell.

25. The c/o's rolled the cell door closed, and ordered the inmates to fight. Faced with no other alternative, and still cuffed, Acosta and Barrera began to kick eachother. But the kicks were make believe, thus neither inmate was truly hurting each other.

26. Acosta was able to sweep Barrera off of his feet. He hoped that this would end the sadistic charade. However, Acosta was wrong. Defendant Walls ordered Acosta to the door to uncuff. Acosta complied. Then Defendant Walls ordered Acosta to assault Barrera while Barrera remained cuffed on the

4E.

cell floor. Acosta refused the direct order stating, "I'm not doing that. Get this dude out of my cell, we're enemies!" Defendant Walls told Acosta, "if you don't beat his ass, we're gonna beat your ass!" Under duress, Acosta rolled Barrera over, and pretended to punch him in the midsection.

27.   Without warning Defendant T. Mandeville sadistically sprayed an excessive amount of O.C. pepper spray directly into the faces of Acosta and Barrera. Defendant Mandeville was aware that Acosta and Barrera both were at the height of their respective COVID-19 infections, as were the other c/o's that were present, because on November 14, 2020, Echo Unit Range 4-the location of the above described incident-was being used as a quarantine wing. Moreover, Barrera was being moved from Echo Unit Range 1 to Echo Unit Range 4 to be quarantined, because he had just tested positive for COVID-19. However, the correctional officers were deliberately indifferent to Acosta's serious medical needs, and instead assaulted him with mace to a degree that amounts to attempted murder-considering the difficulties breathing Acosta was suffering from due to the coronavirus infection even prior to being sprayed by Defendant Mandeville.

### Improper Pepper Spray Decontamination

28.   With his lungs burning, and gasping for air, like a fish out of water, Acosta immediately submitted to hand restraints, begging the c/o's to let him out of the cell because he could not breathe-and certain that he was going to die. But instead, Acosta was re-cuffed and taken to a hot shower to be decontaminated. The hot water activated the chemical agent

4F.

that is O.C. pepper spray. It caused so much pain that Acosta could not stand it, and properly decontaminate. The pepper spray made the hot water feel like boiling water on Acosta's skin. Worse yet, the water made the pepper spray run from head to toe, including Acosta's genitals and anus. Moreover, because Acosta could not properly decontaminate, the pepper spray had a lasting effect of over 72 hours...for all of which Acosta was forced to stay inside without any fresh air, contrary to BOP policy.

**Conspiracy or Aiding and Abetting Attempted Murder and Assault and Battery**

29. While in the shower attempting to decontaminate, Acosta asked c/o Walls why he had forced him to fight Barrera? To which Defendant Walls replied, "we don't just let cellies separate. That's not how it works here. If you want to move, you fight. We've been telling you to beat Barrera's ass for a week. Why do you think we didn't move you?"

30. Acosta was then removed from the shower, and taken to see Defendant Bergmann to do a medical assessment. During the assessment Acosta informed Lt. Grecco, on camera, that his staff had uncuffed him so that he could assault Barrera. It is beleived upon confirmation, that Lt. Grecco never filed a complaint with the Office of Interanl Affairs, as mandated by BOP policy, because he was covering up the crimes and constitutional violations that were being committed by his staff.

31. During the medical assessment Acosta complained to Defendant M. Bergmann and told her that he could not breathe. Defendant Bergmann made entries in Acosta's medical file to reflect that his oxygen level was

4G.

fine. Defendant Bergmann had to decontaminate Acosta's eyes, because the hot water only served to exacerbate the effects of the pepper spray. Defendant Bergmann did nothing more that a staged assessment for the camera, and pronounced Acosta medically stable. Afterward, Acosta was returned to his cell in the isolation unit. Defendant Bergmann provided no other assistance to ensure that Acosta's medical condition, which was a COVID-19 patient whom had just been pepper sprayed, did not devolve into something more serious. Defendant Bergmann's actions were more than medical malpractice or just her exercise of professional medical judgment or opinion. Defendant Bergmann was covering for the c/o's, and thereby conspired ot aided and abetted an attempted murder and/or and assault and battery.

32.  For example, Defendant Bergmann created a medical record that belies or omits facts pertinent to what really occurred on November 14, 2020. In her assessment record, Nurse Bergmann writes: "Inmate was adequately decontaminated at the beginning of the medical assessment." However, that was not true because Acosta was having trouble breathing and was not taken outside for fresh air as required by BOP policy. Nurse Bergmann writes: "Vital signs stable." That is also not true. Nurse Bergmann had just recorded a 100.5 degree fever, and knew, as Acosta's primary medical provider, that he was severely ill from COVID-19. And that being peppered sprayed could only worsen his condition. Defendant Bergmann incredulously writes: "No respiratory compromise noted." But it wasn't noted, because she did not note it. Acosta had just been pepper sprayed for crying out

4H.

loud! Finally, Nurse Bergmann writes: "when asked if the inmate had any injuries he stated, 'I can't tell yet.'" Other than not being able to breathe, Acosta could not tell, at that moment, what internal injuries he was suffering from. It was, in fact, Defendant Bergmann's job to provide Acosta with adequate medical care to determine the extent of the damage caused by pepper spraying a COVID-19 patient. Especially given the novel nature of the pandemic. Rather, Defendant Bergmann did nothing to ensure Acosta's health and safety. On the contrary, every request to see a doctor was met by the same answer, "you gotta ride it out."

33.    On November 14, 2020, at approximately 1:49 p.m., Defendant T. Mandeville fabricated and filed a falsified incident report in furtherence of the named defendant's conspiracy to attempted murder and assault and batter the Plaintiff for personal entertainment and gambling purposes. The Incident Report was filed in an effort to conceal the intentional tort(s) described above. The fabricated Incident Report was expunged, however, at a fair hearing where it was determined that the Barrera's medical record of the alleged fight did not reflect injuries consistent with a fight between Acosta and Barrera.  Specifically,  where Barrera was allegedly cuffed, and not able to block any of the attack Acosta was allegedly inflicting  on him, according to c/o Mandeville.

### False Imprisonment and Official Misconduct

34.    On April 30, 2021, Case Manager Ms. Smith, informed Acosta that he was not progressing to Level Three as scheduled, because he had allegedly

4I.

been in a "fight," according to Defendant Cruze. However, Acosta remained infraction-free for the duration of his housing at AUSP-Thomson (with the exception of the fabricated Incident Report described above-which was expunged).

35. On May 13, 2021, Ms. Smith returned with the news that Defendant Cruze's position was firm. That Acosta's progression to the final phase would be withheld regardless of the fact that the alleged reason for withholding the progression-the fabricated Incident Report-had been expunged from Acosta's disciplinary record. That her hands were tied, and that there was nothing that she could do. Upon hearing the news, Acosta's depression enveloped him to point of suicide. He asked Ms. Smith for help, and she alerted psychology department, and Acosta was placed on suicide watch.

36. On May 13, 2021, while on suicide watch, Defendant Cruze came to speak with Acosta. Mr. Cruze knocked loudly on Acosta's cell door and awakened him. Mr. Cruze summoned Acosta to the door, and asked him if he could hear him clearly? Acosta replied that he could. Mr. Cruze asked Acosta if he had requested to be placed on suicide watch, because he had not "leveled-up?" Acosta replied that he was very sad and depressed, and afraid that he might hurt himself, because he had done nothing to be held back. It was then that Mr. Cruze revealed to Acosta that it was him whom held him back from progressing, because Acosta had allegedly "assaulted" his cell mate on November 14, 2020. Acosta replied that he had not

4J.

assaulted his cell mate, and pointed out that the Disciplinary Hearing Officer had expunged the Incident Report after reviewing the evidence. Mr. Cruze became angry and aggressively stated, "the shot was expunged because of an administrative error!" "You are still guilty of assaulting your cell mate!" "I only set you back for one month, but since you want to play games and write this up, when the memo comes back around I'm gonna set you back to day one, phase one!" Then Mr. Cruze turned to the correctional officer that was watching Acosta on suicide duty, and angrily repeated, "since he wants to play games I'm setting him back to day one, phase one! He's starting the program all over." Then Mr. Cruze stormed out of the medical area where suicide watch is located.

37. On May 14, 2021, Acosta checked out of suicide watch for fear of being retaliated against, although he was more of a mental wreck than when he sought psychiatric help the day before. Acosta was caught in a nightmare he could not awaken from. Acosta requested medication from the unit psychologist, however, he was informed that the regular psychologist was unavailable. Thus, he would have to "stick it out" until Dr. Stoll came back. With Defendant Cruze monitoring Acosta's use of psychology services, and the threat of starting the program over for nothing, Acosta truly had no other alternative.

38. On June 3, 2021, during his unit round, Acosta asked Defendant Burlinson why was he still Level Two, and why hadn't he been leveled-up to Level Three or SMU Complete? Mr. Burlinson told Acosta that Acosta

4K.

knew why he wasn't being leveled-up. Acosta asked Mr. Burlinson if he had put him in for progression (which is amongst Defendant Burlinson's duties as a case manager at AUSP-Thomson). And Defendant Burlinson told him that he would put Acosta in whenever he put him in, and walked away from his cell door.

39. On July 17, 2021, Acosta was subsequently moved to Hotel-block ("H-2"), after achieving phase Three of the SMU program. At some point during Acosta's stay in H-2, Dr. Stoll submitted Acosta's request for depression medication to the medical provider, whom issued Escitalopram Oxalate to alleviate some of Acosta's psychological distress. A medication that Acosta continues to be prescribed to deal with the trauma caused by the defendants.

40. On August 11, 2021, Acosta asked H-block Unit Manager, Mr. Borden, about his SMU Complete Level. Mr Borden informed Acosta that he was in fact, SMU complete. The level was important, because in addition to symbolizing progression, it meant increased privileges. For example, inmates that were SMU Complete receive 510 calling minutes during the pandemic to socialize with their friends and family. Armed with the information that he had completed the SMU program, Acosta attempted to call his wife. However, he did not have any calling minutes. So he emailed Trust Fund, only to find out that he was still on Level Three, and he could not receive the privilege until his Unit Team updated the change in the system-something known and unknown co-conspirators were working

4L.

in concert to prevent.

41.     During a unit round Acosta spoke with Unit Manager Ms. Kraemer, whom informed him that he was being reviewed for SMU completion on August 17, 2021. Meaning that if Acosta was infraction-free by that date he would be SMU complete. August 17th came and went, and Acosta remained infraction-free, and on Level Three. On August 23, 2021, Acosta emailed Ms. Kraemer requesting his level, and 510 minutes. Ms. Kraemer never responded.

42.     On September 20, 2021, Acosta emailed Warden A. Ciolli, summarizing the events described in this Complaint, and requesting that he be submitted for transfer, and that he receive his phone privileges. The email went unanswered. In addition to the email, Acosta complained to Warden Ciolli in person various times. The warden just stood by, and allowed the official misconduct and false imprisonment to continue.

43.     On September 23, 2021, Acosta again emailed Trust Fund requesting his phone minutes upon receiving information that he was SMU complete from Defendant Burlinson. Trust Fund again confirmed that it was Acosta's Unit Team that was denying the privilege (i.e., Mr. Burlinson, an Unknown Case Manager, Mr. Borden, and Ms. Kraemer), and not Trust Fund.

44.     Upon confirmation, it is believed that in October or November, 2021, SIS Technician Currie came to H-2 and brought Acosta a "debrief" packet. Mr. Currie wanted Acosta to debrief on the gang he formally had

4M.

membership with. Mr. Currie told Acosta that Defendant T. Cruze wanted to debrief him, but he thought it was a better idea if he, Mr. Currie, did it. Acosta was perplexed that he was being asked to derief, because: (1) Acosta had been at this time a "drop-out" (meaning no longer part of a gang) since 2009, that is, Acosta had been a drop out for approximately 12 to 13 years; and (2) Acosta has already been to every drop out yard in America—which is the main objective of debriefing a federal prisoner who attempts to be housed in a special need prison yard, or otherwise attempts to be housed in protective custody. Moreover, the threat against Acosta by the surenos gang, Acosta's former gang, has been verified after a proper investigation was conducted by SIS at the United States Penitentiary-Florence, in Florence, Colorado, in 2009. Therefore, the "debrief" packet was just a way for Defendant Cruze, and others unknown to Acosta, to retaliate for writing the OIG and complaining.

45. On November 17, 2021, Acosta wrote an email to Case Manager Coordinator ("CMC") Ms. McKenzie, and made her aware that he was being discriminated against by the Special Investigative Supervisor ("SIS") Office, and that he feared that SIS was attempting to somehow transfer him to a yard he could not walk. Mean sending Acosta to a prison where he had known gang separations or enemies. Ms. McKenzie did not respond. The matter was of utmost importance, because if Acosta were sent to a prison that housed gang separations, due to Acosta's drop-out status with the gang or enemies, Acosta could potentially be seriously injured and/or

killed—hence the BOP's creation of the "drop-out" yard, and Acosta's housing in them for over a decade. Moreover, the matter was within the scope of Ms. McKenzie's duties, because as the CMC she oversees prisoner transfers submitted by case managers.

46. On November 22, 2021, Defendant Burlinson told Acosta that he had "special mail," but the he was not going to give it to him, because Acosta had written a tort claim against him, and the contents of the special mail was more of Acosta's "crap" and complaining about SIS and his Unit Team. The next day, Acosta received a mail rejection stating that, "one envelope containing 57 pages," was being rejected, because "only five pages [were] allowed per envelope." The mail rejection provided Acosta with a photocopy of the envelope that was rejected. The envelope was clearly marked **"LEGAL MAIL"** and **"SPECIAL MAIL OPEN ONLY IN PRESENCE OF THE INMATE[.]"** Moreover, the contents of the mail were legal in nature—it was Acosta's amended complaint with exhibits in Acosta v. United States of America, et el., No. 21-cv-50194.

47. On March 2, 2022, after exactly 18 months, twice as long as it generally takes to complete the SMU program at AUSP-Thomson—a supermax facility, Acosta was transferred to the Federal Correctional Complex ("FCC") Coleman, United States Penitentiary-Pen 1. FCC Coleman-USP-Pen 1 is an "active" yard, or otherwise the facility is not a drop-out yard. It houses active sureno gang members—Acosta former gang, and separatees. The BOP is aware of the serious threat that a person in Acosta's position

40.

faces being housed at FCC Coleman-Pen 1. In fact, upon arrival at FCC Coleman-Pen 1, Acosta was placed in the Special Housing Unit ("SHU"), which is segregation to be sure, on SIS investigation to assess the threat that the surenos pose to Acosta. The threat was verified, and Acosta was transferred from FCC Coleman on October 3, 2022.

48.    Acosta was on continuous lock down from January 3, 2020 through October 3, 2022. Put another way, Acosta was segregated for 34 months. Sixteen of those months amount to false imprisonment due to the actions and omissions of the defendants and/or their agents.

49.    The claims presented herein arise from the attempted murder and assault and battery described in paragraphs 22-28, for which Acosta suffered a significant injury, and is the basis of the named defendants retaliation and denial of equal protection of the law. Which led to Acosta's unlawful loss of liberty, privileges, and threat on his life. Based on the facts presented herein, Acosta seeks compensatory or general damages for the loss of privileges and quality of life in his living conditions, and loss of the limited liberty enjoyed by prisoners, resulting from his segregated confinement, in that he was confined for 23 hours a day in a cell roughly 60 square feet, and deprived of most of his personal property. As well as the ability to work, attend educational and vocational programs, watch television, associate with other prisoners, attend outdoor recreation in a congregate setting with other prisoners. With the ability to play sports like softball, basketball, and run the

4P.

track, and other recreational activities, attend meals with other prisoners, attend religious services, use the phone, emails, listen to bought music on his personal MP3, and watch rented movies on his personal tablet. Acosta separately and additionally seeks compensatory damages for the mental or emotional distress resulting from his prolonged confinement in segregation or in segregation-like conditions without due process of law. Moreover, Acosta seeks punitive damages against the named defendants, with the exception of the United States, for their willful and malicious conduct in attempting to murder Acosta, and then confining him to segregation-like conditions in the SMU at AUSP Thomson-a supermax facility by the United States Department of Justice's definition-without a hearing, in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution, and amounting to false imprisonment.

## Cause of Action

50. The actions of Defendants: Walls, Mandeville, Wilson, and Root as set forth in paragraphs 22-28 constitute attempted murder and assault and battery, in violation of Illinois common law. Under the Fedral Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful actions of correctional officers; Walls, Mandeville, Wilson, and Root as they were acting within the scope of their employment as law enforcement officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice, an agency of the United States of

America.

51. The actions of Defendants: Barmes, Walls, Mandeville, Wilson, Root, and Bergmann, as set forth in paragraphs 16, 29-33 constitute conspiracy and aiding and abetting an attempted murder and assault and battery, in violation of Illinois common law. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful actions of correctional officers: Barmes, Walls, Mandeville, Wilson, Root, and Bergmann, as they were acting within the scope of their employment as law enforcement officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and agency of the United States of America.

52. The actions of Defendents Barmes, Walls, Mandeville, Wilson, Root, and Bergmann as set forth in paragraphs 16, 22-38 constitute negligence and intentional infliction of emotional distress, in violation of Illinois common law. Defendants: Barmes, Walls, Mandeville, Wilson, Root, and Bergmann had a duty of care and protection. Defendants breached their duty when Barmes told Acosta and Barrera that if they wanted to be separated they would have to "fight." Moreover, Defendants breached their duty of care when they conspired and aided and abetted eachother to: (1) force Barrera into Acosta's assigned cell, over both inmates' protest that they were enemies-especially given that it was done for the malicious and sadistic purpose of gambling and personal entertainment; and (2) excessively spraying Acosta, a COVID-19 patient, in the face with pepper spray at the height of his coronavirus infection, with deliberate

4R.

indifference to his serious medical needs, and in total disregard for his life, which amounts to an attempted murder and an assault and battery. This breach of their duty of care was done intentionally to inflict emotional distress, and constitutes negligence, in violation of Illinois common law, and 18 U.S.C. § 4042(a), and was the direct and proximate cause of the Plaintiff's pain and injury. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful actions of correctional officers: Barmes, Walls, Wilson, Mandeville, Root, and Bergmann, as they were acting within the scope of their employment as law enforcement officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

53. The actions of Defendants: Barmes, Walls, Wilson, Root, Bermann, Cruze, and Burlinson; and Federal Bureau of Prisons employees: A. Ciolli, Warden, Ms. McKenzie, CMC; Mr. Borden, Unit Manager; Ms. Kraemer, Unit Manager; and Unknown Case Manager, as set forth in paragraphs 16, 22-33, 36, 38, 40-42, and 44-46 constitute official misconduct, in violation of Illinois common law. Defendant Barmes had a duty to protect the Plaintiff when the Plaintiff informed him that a fight was imminent if he was not separated from Barrera. Barmes breached that duty when he told Acosta that he had to "fight" if he wanted to be separated, in violation of 18 U.S.C. § 4042(a)(2); and 28 CFR § 541.27. Defendant Wilson also breached his duty of care when he gambled "$100 or $20" that the "Mexican gets his a** kicked," in violation of 18 U.S.C. § 4042(a)(2); and Program Statement,

4S.

1210.24, Internal Affairs, Office of. Defendant Mandeville also had a duty of care. He breached that duty when he attempted to murder the Plaintiff, and then fabricated an incident report to cover up his misconduct, and the misconduct of his cohorts, in violation of 18 U.S.C. § 4042(a)(2); and Program Statement, 1210.24, Internal Affairs, Office Of. Defendants: Walls, Wilson, and Root had a duty to protect Acosta. They breached that duty when they failed to intervene to protect Acosta's life from Mandeville's attempt to murder him, and otherwise aided and abetted the attempted murder, in violation of 18 U.S.C. § 4042(a); and Program Statement, 1210.24, Internal Affairs, Office of. Defendants: Walls, Wilson, Mandeville, and Root also breached their duty of care when they failed to properly decontaminate Acosta after pepper spraying him, in violation of 18 U.S.C. § 4042(a)(2); and Program Statement, 5576.06, Oleoresin Capsicum (OC) Aerosol Spray. Defendant Bergmann Breached her duty of care when she falsified Acosta's medical file to reflect that he was fine to cover up for the c/o's that attempted to murder Acosta, and when she failed to send Acosta out for outside medical attention—given the novelty of the coronavirus pandemic, in violation of 18 U.S.C. § 4042(a)(2). The named and unnamed defendants and employees of the Federal Bureau of Prisons breach of duties, as described above, constitute official misconduct, in violation of Illinois common law, and was the proximate cause of the Plaintiff's pain and injury. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful actions and omissions of the named and unnamed

4T.

defendants, and employees, servants or agents of the United States of America, as they were acting within the scope of their employment as law enforcement officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

54. The omission and failure to provide adequate medical care by Defendant Bergmann, as set forth in paragraphs 30-32 constitute medical negligence, in violation of Illinois common law. Nurse Bergmann had a duty to provide the Plaintiff with adequate medical care. That standard of care was established by **18 U.S.C. § 4042(a)(2)**; and Program Statement 6010.05, Health Service Administration. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful omission or failure by Defendant Bergmann, as she was acting within the scope of her employment as a law enforcement officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

55. The omission and failure to act by Warden Ciolli, as set forth in paragraph 42 constitutes false imprisonment or excessive confinement, in violation of Illinois common law. Warden Ciolli had a duty to transfer the Plaintiff from the SMU to a general population or to another appropriate facility within 9-13 months. That standard of care was established by Program Statement 5217.02, Special Management Units. Under

the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful omissions and failures of Warden Ciolli, as he was acting within the scope of his employment as a law enforcement officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

56.    The omission and failure to act of CMC McKenzie, as set forth in paragraph 45 constitutes negligent transfer, in violation of Illinois common law. CMC McKenzie had a duty to make sure Acosta's case manager reviewed he Separatee Data and Central Inmate Monitoring System ("CIM") concerns to ensure that Acosta was not transferred to a correctional facility where he had separatees or known enemies. That standard of care was established by 18 U.S.C. § 4042(a)(2); and Program Statement 5100.08, Inmate Security Designation and Custody Classification; Program Statement, 5180.05, Central Inmate Monitoring System; and Program Statement 5322.13, Inmate Classification and Program Review. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful omissions and failures of CMC McKenzie, as she was acting within the scope of her employment as a law enforcement officer of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

57.    The actions and omissions of named and unnamed defendants, incuding but not limited to, Defendant: Barmes, Walls, Wilson, Mandeville, Root, Bergmann, Cruze, and Burlinson; and the employees, servants, or agents, known and unknown, as set forth in paragrapghs 16, 22-33, 36, 38, 40-42,

4V.

and 44-46 constitute intentional infliction of emotional distress, in violation of 18 U.S.C. § 4042(a)(2); and Illinois common law. Under the Federal Tort Claims Act, Defendant United States of America is liable to the Plaintiff for the unlawful actions of Defendants Barmes, Walls, Wilson, Mandeville, Root, and Bergmann. As well as the actions and omissions of Warden Ciolli, CMC McKenzie, Unit Manager Borden, Unit Manager Kraemer, SIS Technician Currie, and an unknown case manager. As they were acting within the scope of their employment as correctional officers of the Federal Bureau of Prisons, a branch of the United States Department of Justice, and an agency of the United States of America.

58.    As a direct and proximate result of the combined negligent and intentional actions of the defendants, their agents, servants, and/or employees, the Plaintiff has suffered injury to his personal liberty, as well as mental, emotional, and physical injuries. Therefore, Defendant United States of America is liable to the Plaintiff for damages in the amount indicated below.

59.    The actions of Defendant Barmes, as set forth in paragrapgh 16 violated Plaintiff's right to equal protection of the law under the Fifth Amendment to the United States Constitution, under a "class-of-one" theory, because similarly situated SMU inmates, like Job Lopez-Garcia and Daniel Michael Salinas were not informed that they had to "fight" if they wanted to separate. Defendant Barmes is liable to the Plaintiff for these unlawful actions that amount discrimination in the protection Plaintiff received at AUSP-Thomson.

4W.

60. The omissions and actions of Defendant Bergmann, as set forth in paragraphs 29-32 constitute deliberate indifference to the Plaintiff's serious medical needs, in violation of the Eighth Amendment to the United States Constitution. Defendant Bergmann is liable to the Plaintiff for these unlawful actions in violation of the Constitution.

61. The actions of Defendant Cruze, as set forth in paragraphs 36-37 violated Acosta's right to equal protection of the law under the Fifth Amendment to the United States Constitution, under a "class-of-one" theory, because similarly situated SMU inmates, like Job Lopez-Garcia, and Daniel Michael Salinas were not retaliated against for filing complaints; and similarly situated inmates like James Radford, and Robert Shipp completed the SMU program within 9 months consistent with their clear conduct and SMU programming obligations-which was identical to Plaintiff's. Defendant Cruze is liable to the Plaintiff for these unlawful actions that amount to discrimination, in violation of the Constitution.

62. The actions of Defendant Burlinson, as set forth in paragraphs 38 and 46 violated Plaintiff's right to equal protection of the law under the Fifth Amendment to the United States Constitution, under a "class-of-one" theory, because similarly situated SMU inmates like Job Lopez-Garcia, and Daniel Michael Salinas were not retaliated against for filing complaints. And similarly situated SMU inmates like James Tristan Bostic, and Bradley Shane Shelton did not have their "legal mail" rejected, although it was also mailed by "BNC Prisoner Services, exceeded 5pages, and was considered 'general correspondence.'" Defendant Burlinson is

4X.

liable to the Plaintiff for these unlawful actions that amount to discrimination resulting in unlawful imprisonment, loss of privileges; and interference with Plaintiff's access to the courts.

63.    The actions of Defendants: Walls, Mandeville, Wilson, and Root, as set forth in paragraphs 22-27, violated Plaintiff's right to equal protection of the law under the Fifth Amendment to the United States Constitution, under a "class-of-one" theory, because similarly situated SMU inmates were not treated with pepper spray to care for their respective coronavirus infections. Defendants: Walls, Mandeville, Wilson, and Root are liable to the Plaintiff for these unlawful actions that amount to discrimination in the protection of Plaintiff's health and saftey while incarcerated at AUSP-Thomson.

## Prayer for Relief

A.    On the claims stated in paragrapghs 16, 22-33, 36, 38, 40-42, and 44-46, the Plaintiff asks the Court to enter judgment against Defendant United States of America.

B.    On the claims stated in paragraphs 16, 22-33, 36, 38, 40-42, and 44-46, the Plaintiff asks the Court to enter judgment against the Defendant United States of America, and hold Defendant United States of America liable to the Plaintiff for compensatory and general damages.

C.    On the claims stated in paragraph 36-37, the Plaintiff asks the Court to enter judgement against Defendant Cruze.

4Y.

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

D.     On the claims stated in paragraphs 38 and 46, the Plaintiff asks the Court to enter judgment against Defendant Burlinson.

E.     On the claims stated in paragraphs 22-33, the Plaintiff asks the Court to enter judgment against Defendant: Walls, Mandeville, Wilson, and Root.

F.     For the injuries that the Plaintiff suffered as a result of the claims stated in paragraphs 16, 22-33, 36, 38, 40-42, and 44-46, the Plaintiff asks the Court to hold Defendants United States of America, Bergmann, Barmes, Cruze, Burlinson, Walls, and Root jointly and severally liable for compensatory or general damages; and court costs.

G.     For the claims stated in paragraphs 16, 22-33, 36, 40-42, and 44-46, the Plaintiff asks the Court to issue a declaratory judgement stating that the Defendants violated the Plaintiff's Fifth and Eighth Amendment constitutional rights.

5                                                      Revised 9/2007

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

**V.    Relief:**

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.

Plaintiff requests that the Court render judgment against the Defendants in the sum to be shown at trial, but in no event less than $2,500,000.00 plus punitive damages in the sum of $150,000.00 against each defendant, with the exception of defendant United States of America, and any other relief the Court deems just and proper.

**VI.    The plaintiff demands that the case be tried by a jury.    ☒ YES    ☐ NO**

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief. I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this __15th__ day of __April__, 20__23__

__Hanoi Acosta (original)__

__Hanoi Acosta__
(Signature of plaintiff or plaintiffs)

Hanoi Barbaro Acosta
(Print name)

87406-006
(I.D. Number)
FCI Talladega

PMB 1000

Talladega, AL 35160
(Address)

Revised 9/2007
[If you need additional space for ANY section, please attach an additional sheet and reference that section.]